<pre>
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3

     UNITED STATES OF AMERICA,      )     Case No. 3:18-CR-00171-DJH
 4                                  )
                Plaintiff,          )
 5                                  )
     v.                             )
 6                                  )
     JAMES CARROLL,                 )
 7                                  )     October 9, 2018
                Defendant.          )     Louisville, Kentucky
 8

 9                              *  *  *  *  *

10          TRANSCRIPT OF PRELIMINARY AND DETENTION HEARINGS
                  BEFORE HONORABLE REGINA S. EDWARDS
11                  UNITED STATES MAGISTRATE JUDGE

12                              *  *  *  *  *

13   APPEARANCES:

14   For United States:       Thomas W. Dyke
                              U. S. Attorney's Office
15                            717 West Broadway
                              Louisville, KY 40202
16
     For Defendant:           Aubrey Williams
17                            Aubrey Williams & Associates
                              401 West Main Street, Suite 1708
18                            Louisville, KY 40202

19

20   Transcriber:             Dena Legg, RDR, CRR, CCR-KY
                              Official Court Reporter
21                            232 U. S. Courthouse
                              Louisville, KY 40202
22

23

     Proceedings recorded by digital recording.  Transcript produced
24   by computer from audio recording that the Court provided to
     transcriber.
25
</pre>

```
 1        (Begin proceedings in open court.)
 2              THE COURT:  Good afternoon.  Please call the case.
 3              DEPUTY CLERK:  Yes, Your Honor.  3:18-MJ-567, United
 4     States of America versus James Carroll.  We're here this
 5     afternoon for a preliminary and a detention hearing, Your Honor.
 6              MR. DYKE:  Good afternoon, Your Honor.  Tom Dyke for
 7     the United States.
 8              MR. WILLIAMS:  Good afternoon, Your Honor.  Aubrey
 9     Williams for the defendant.
10              THE COURT:  All right.  Let's see.  Is the United
11     States moving for detention in this case?
12              MR. DYKE:  Beg your pardon?  Yes, ma'am.
13              THE COURT:  All right.
14              MR. DYKE:  Yes.
15              THE COURT:  And is this a case of presumption for
16     detention?
17              MR. DYKE:  Not a presumption in favor of detention,
18     Judge.
19              THE COURT:  Okay.  All right.  Are there any other
20     preliminary matters that we need to address?
21              MR. WILLIAMS:  No, ma'am, not for the defense.
22              MR. DYKE:  I don't think so, Judge.  We're ready to go
23     forward with the probable cause hearing/preliminary hearing.
24              MR. WILLIAMS:  Likewise, Judge.
25              THE COURT:  Then let's begin.
```

Herring - Direct

1          MR. DYKE:  All right.  We'll call Detective Herring to

2     the stand, Your Honor.

3          DEPUTY CLERK:  Please raise your right hand.

4      (DETECTIVE JOHNATHAN HERRING, called by the Government,

5     sworn.)

6          DEPUTY CLERK:  Thank you.

7                    DIRECT EXAMINATION

8     BY MR. DYKE:

9     Q.  Good afternoon, sir.  Can you tell us your name, please.

10    A.  Yes, sir.  Johnathan Herring.

11    Q.  And, Mr. Herring, how are you employed?

12    A.  With the Louisville Metro Police Department as a detective

13    in the Third Division.

14    Q.  How long have you been with the police department?

15    A.  Almost six years.

16    Q.  And how long have you been assigned as a detective over

17    there?

18    A.  Almost a year, sir.

19    Q.  What division or part of town are you assigned to work?

20    A.  I work in the Third Division, which is Dixie Highway, which

21    covers PRP and Valley Station, that area.

22    Q.  Okay.  From your employment over there in your work, are you

23    familiar with, I guess, a theft or burglary of some firearms

24    that took place in August of this year?

25    A.  Yes, sir.  There was a series of burglaries that involved an

1   unoccupied building --

2   Q.   Okay.

3   A.   -- where a large number of firearms were stolen.

4   Q.   And do you know, was that -- the building, was it associated

5   with a firearms dealer, I guess?

6   A.   Yes, sir, the building's owned by Winfred Sumner, also goes

7   by Biff.

8   Q.   Biff?

9   A.   And he owns a gun shop --

10  Q.   All right.

11  A.   -- in the area.

12  Q.   Okay.  Do you recall about when it was that you found or

13  learned about the fact that some guns had gone up missing?

14  A.   It was the later part of August.

15  Q.   The latter part of August?

16  A.   I don't have the exact date in front of me.

17  Q.   So once you discovered that, what did you do?

18  A.   The day that we discovered that a burglary had happened, we

19  went and did a walk-through of the building with the owner,

20  Mr. Sumner.

21  Q.   Okay.

22  A.   And ATF was with me, as well as a special agent with the ATF

23  was with me.  We processed the scene.  I called for a crime

24  scene unit with LMPD to come, did some preliminary evidence

25  collection.  At the time we didn't really know what we had, and

1    it was -- we had very little information on that first day.

2    Q.   Okay.  As the investigation has gone on, have you -- do you

3    have an estimate in any way or an idea as to how many guns were

4    stolen over the course of this period of time?

5    A.   Yes, sir.  We believe it's maybe up to a thousand guns that

6    were stolen.

7    Q.   A thousand guns.  All right.  Has Mr. Sumner to this point

8    been able to give you a detailed accounting of each and every

9    one?

10   A.   No, sir.

11   Q.   Okay.  Has he provided information on some of them?

12   A.   Yes, sir.

13   Q.   And have -- what do you have to have about -- what

14   information do you have to have before a gun can be put in the

15   NCIC so that, if it's located, it will be -- it will come back

16   as stolen?

17   A.   You need the make of the gun, the model of the gun, the

18   caliber of the gun, and a serial number.

19   Q.   Okay.  And you had that for some but not all?

20   A.   For some.

21   Q.   Okay.  All right.  I want to direct -- so over this -- since

22   you learned about the break-in, have you been involved in the

23   investigation of some folks that are suspected of breaking into

24   the place?

25   A.   Yes, sir.

1    Q.  All right.  And have you worked with ATF on that?

2    A.  Yes, sir.

3    Q.  Let's go back.  Let's go to October 3rd of 2018, the date

4    that Mr. Carroll was arrested, and talk about that.  Did you get

5    a call from an Agent Ockerman on that date?

6    A.  Yes, sir, I did, I believe around 4:15 in the afternoon.

7    Q.  Okay.  And what did -- is it Jennifer Ockerman?  Is that her

8    name?

9    A.  Yes, sir.

10   Q.  Okay.  Had you worked with her before on this?

11   A.  Yes, sir.

12   Q.  Okay.  What did she tell you and as a result of that what

13   did you-all do?

14   A.  She told me that they had received a tip that there were

15   several people inside of a known location we've been dealing

16   with in result of this investigation at 13304 Ashlawn Drive, and

17   that they were actively hiding guns in the attic of that

18   residence.  And she was asking for my assistance to try and get

19   some patrol officers to that location as quickly as possible.

20   Q.  Okay.  So the address was 13004 Ashlawn?

21   A.  Yes, 13304.

22   Q.  13304?

23   A.  Yes, sir.

24   Q.  Sorry about that.  And how far is that location -- the 13304

25   Ashlawn, how far is that from the place where these guns got

Herring - Direct

1    stolen from?

2    A.   It's directly behind it.   There's a set of train tracks that

3    runs between the two buildings, but it's probably less than 50

4    yards between the two actual buildings.

5    Q.   Okay.   And had you gone to that address before as part of

6    this investigation?

7    A.   Yes, sir.   I have been to that house prior to this

8    investigation as well.

9    Q.   Okay.  All right.   Okay.   So you were familiar with the

10   resident there?

11   A.   Yes, sir.

12   Q.   And what's his name again?

13   A.   Greg Whitaker.

14   Q.   All right.   Now -- so let's talk about this day.   You got

15   the call from Jennifer or Special Agent Ockerman.   What did you

16   do after that?

17   A.   I turned my radio on.   I was off duty at the time.   I turned

18   my radio on and was going to begin trying to get some cars

19   dispatched to that area, but as I turned my radio on, it was

20   already happening.

21   Q.   Okay.

22   A.   There was -- I believe it was LMPD TFO Alvey was on the

23   radio asking for cars to start down that way.   And I was en

24   route myself, but I was coming from quite a distance.

25   Q.   Okay.

1   A.  And so I was -- I was monitoring radio traffic while I was

2   en route and trying to get things straight of what exactly was

3   going on.  I had very little information initially.

4   Q.  Okay.  All right.  So as you're driving over there, did

5   you -- did any police officers take up surveillance of that

6   location?

7   A.  Yes, sir.  There's a patrol officer, Mark Manning, that had

8   eyes on the house.  I don't know where he was at exactly, but I

9   know he had a visual on the house.

10  Q.  Okay.  And was he monitoring, letting you-all know what he

11  saw and that kind of thing?

12  A.  Yes, he was [inaudible].

13  Q.  All right.  So what happened after surveillance started on

14  the house?

15  A.  A short time later, a vehicle was seen leaving that house,

16  and he was giving updates as to where that vehicle was.  And a

17  decision was made by those patrol officers to make a traffic

18  stop on that car.

19  Q.  Okay.

20  A.  Which they did.

21  Q.  All right.  That had -- that didn't really have anything to

22  do with Mr. Carroll at this point?

23  A.  Correct.

24  Q.  We're just trying to fill it in with the details?

25  A.  Correct.

1   Q.   Okay.  So after you got there -- let's take it from the time

2   you got there.  What happened when you got there?

3   A.   Sure.  I was arriving in the area of where this was all

4   happening as the traffic stop was actually happening.

5   Q.   Okay.

6   A.   I was on Dixie -- they stopped the car in the Biff's Motel,

7   which is another property in the area that's owned by the

8   same victim.

9   Q.   Okay.

10  A.   And I knew at that point nobody was watching the house, so I

11  went and took over surveillance of the house.

12  Q.   Okay.  And where were you -- where were you sitting and

13  watching the house from?

14  A.   There's a church on the corner of Pendelton and Meadowlawn,

15  and I was in the front parking lot facing the house in my

16  vehicle.

17  Q.   Okay.  Was it still daylight at this time?

18  A.   It was.

19  Q.   All right.  And did you have an unobstructed view of the

20  house?  Could you see what was going on?

21  A.   Yes, sir.

22  Q.   All right.  Okay.  So as you were sitting there, tell us

23  what happened, please.

24  A.   A short time after I was there, I saw a subject, who I later

25  identified as Mr. Carroll, come out of the side door of the

1    house.  And there was a motorcycle parked in the driveway of

2    that house.  There was a trunk that I saw him open.

3    Q.  Okay.

4    A.  I could only -- he had his back to me, so I could only see

5    that he had opened the trunk and was standing in front of it,

6    and then he went back into the house.

7    Q.  Okay.  Now, this motorcycle, is it a -- how many wheels does

8    it have?

9    A.  If I remember correctly, it's a tricycle-type set of wheels.

10   Q.  Okay.  Three wheels, two on the back and one in the front?

11   A.  Yes, sir.

12   Q.  Okay.  And you say it had like a trunk device on the back?

13   A.  Yes, sir.

14   Q.  Okay.  And you saw Mr. Carroll get -- open the trunk lid?

15   A.  Yes, sir.

16   Q.  And close it?

17   A.  Yes, sir.

18   Q.  And then go back in the house?

19   A.  Correct.

20   Q.  Okay.  All right.  During the time you were sitting there,

21   did anybody else come out of the house that you saw?

22   A.  A female came out of the house, and she walked towards my

23   area.  There's a field, a small field between the church and the

24   house.  She cut through the field and she was in the parking lot

25   pretty close to where my truck was.  And she was kind of peeking

Herring - Direct

1    in, kind of looking at me, because I was facing the house, so I

2    made the decision to pull my truck around and detain her.  I

3    didn't want her to call anyone that may have been in the house

4    at that time.

5    Q.  Based on your experience, what did you think she was there

6    to do?

7    A.  At the house?

8    Q.  Uh-huh, or coming out and looking in your truck and

9    actually --

10   A.  I believe she was looking to see if I was the police that

11   was watching the house.

12   Q.  Okay.  All right.  At that point was there a decision made

13   to go up and approach the house?

14   A.  Yes, there was.

15   Q.  Okay.  And who all approached the house, best of your

16   recollection?

17   A.  The best of -- it was myself, Special Agent Sanchez and

18   Johnson, and there was a -- some patrol officers as well with

19   LMPD.

20   Q.  Okay.

21   A.  I believe Officer Grottick [phonetic] was there and I

22   believe Officer Shen [phonetic] was there, but I'm not sure

23   exactly which officers were there.

24   Q.  Okay.  Once you-all went up to the house, do you remember

25   who it was that went up to the door and knocked and that kind of

1    thing?

2    A.   Agent Johnson.

3    Q.   Johnson.  All right.  And were you-all -- did you-all want

4    to try and get into the house and see if there were any guns in

5    there?

6    A.   Yes, sir, that was [inaudible].

7    Q.   All right.  And was -- did anyone in the house -- did the

8    owner of the house give you-all consent to go in?

9    A.   He did.

10   Q.   All right.  And is that Mr. --

11   A.   Whitaker.

12   Q.   Greg Whitaker?

13   A.   Yes, sir.

14   Q.   Okay.  So he allowed you-all to come in?

15   A.   Yes, sir.

16   Q.   So did you, and Special Agent Johnson, and Special Agent

17   Sanchez go in?

18   A.   I know myself and Agent Johnson did.  I'm not sure if

19   Sanchez went in the house initially.

20   Q.   Okay.  All right.  Well, tell us what you did when you got

21   in there.

22   A.   Sure.  I went off -- I went in the house, and whoever went

23   in front of me went to the left, so I went to the right.  There

24   was a bedroom on the right, which I -- I know the layout of that

25   house because I've been in there before.

Herring - Direct

1    Q.   Okay.

2    A.   There was a shut door, bedroom door.  I knocked on the door

3    and announced myself, and someone inside that room acknowledged

4    me and said they were in there.  I opened the door and

5    Mr. Carroll was sitting on the bed of the bedroom.

6    Q.   Okay.  All right.  What else did you see in the bedroom?

7    Was there anything else in there that caught your attention?

8    A.   It's a small room, yeah.  It's a small room.  There's a bed.

9    There was a dresser to the right.  There's a lot of clutter.

10   There was a lot of tools, screwdrivers and stuff, hand tools on

11   the bed.  There's a lot of knives and stuff laying out.  There's

12   a lot of [inaudible].

13   Q.   All right.  As a result of that, what did you do?

14   A.   I placed Mr. Carroll in handcuffs.

15   Q.   Okay.  Was he under arrest at that point?

16   A.   No, sir.

17   Q.   Did he have -- did you have any knowledge about him having

18   an arrest warrant for him?

19   A.   I was -- I had a pretty good idea that -- I had checked

20   recently, and I knew that at some point he did have an arrest

21   warrant.

22   Q.   Okay.

23   A.   But I hadn't confirmed it at that point that day.

24   Q.   Okay.

25   A.   I had a pretty good suspicion that day.

Herring - Direct

1   Q.  Very good.  All right.  What happened after you placed him

2   in the handcuffs for -- I guess to secure him?

3   A.  I asked him his name, because I -- at that point, I didn't

4   know who he was exactly.

5   Q.  Okay.

6   A.  I thought he might have been another subject whose room that

7   is.  I think I asked him if he was Roland.  He said no, his name

8   was James Carroll.

9   Q.  Okay.

10  A.  That was when I -- I knew the name already.  And so at that

11  point, I decided to leave him in handcuffs.

12  Q.  Okay.

13  A.  Even after we took him out of that room.

14  Q.  Okay.

15  A.  Just because I had a pretty good idea that he had the arrest

16  warrant.  And I believe at that point I even asked him, I said,

17  "Do you think you have a warrant?"  And he said, "I believe I

18  do."

19  Q.  Okay.  All right.  And so did he stay in the house while, I

20  guess, the search progressed?

21  A.  Yes, sir.  There's an EasyChair in the living room.  I did a

22  quick search to make sure there was no needles, or guns, or

23  anything like that, knives inside of that chair, and after

24  searching that, I allowed him to sit on that chair.

25  Q.  Okay.  All right.  So he sat there and the search

Herring - Direct

1    progressed.  Do you know if any other guns or any guns were

2    found in the house?

3    A.   There were no guns found in the house.

4    Q.   Okay.  When it was time to go, what -- tell us what

5    happened.

6    A.   We went outside with Mr. Carroll, and we kind of walked

7    around the property, because we had received some tips that guns

8    had been buried in the yard.

9    Q.   Okay.

10   A.   We were kind of looking to see if there was any fresh, dug

11   up dirt, any signs of anything like that happening.

12   Q.   Okay.

13   A.   And then I remember at that point the motorcycle.  When we

14   came back out, I saw the motorcycle again, and I wanted to

15   verify that that motorcycle belonged there.  So I had one of the

16   beat officers -- I got the VIN number.  It was kind of hard to

17   find on the bike.  I wrote it down.  I had one of the beat

18   officers that was on scene run it through NCIC.

19   Q.   Okay.  And to your knowledge, did it come back as being

20   stolen?

21   A.   No, it did not.

22   Q.   At that point anyway?

23   A.   Correct.

24   Q.   Okay.  So then did you ask Mr. Carroll about the tricycle,

25   the motorcycle there?

Herring - Direct

1    A.   Yeah, I asked if he knew whose it was, and he said it was

2    someone named Cosmo or Cosmos.

3    Q.   Okay.

4    A.   He had said that he -- he rode it around the street a couple

5    times, was supposed to be doing some work on [inaudible].

6    Q.   Okay.  All right.  And did you ask him about getting into

7    the trunk?

8    A.   Yeah, I asked if -- I saw, you know -- I'm sorry.  I asked

9    if he knew -- if there was anything in that trunk that I should

10   know about, and he said there might be a gun in there.

11   Q.   Okay.  Might be a gun?

12   A.   Yes, sir.

13   Q.   All right.  Did he say anything about the condition of the

14   gun that might be in there?

15   A.   Yeah, I think he referred a "blown up" gun or "blowed up"

16   gun, something --

17   Q.   Blown up gun?

18   A.   Something along those lines.

19   Q.   Okay.  All right.  And did you -- did you open the trunk?

20   A.   I did.  I asked Mr. Carroll if he had the key for it, and he

21   said there was no key.  You have to use a screwdriver to open

22   it, so I asked -- I went back in the residence and asked

23   Mr. Whitaker to borrow a screwdriver --

24   Q.   Okay.

25   A.   -- who gave me one and said, "And if it's on my property,

1    you can do" -- and so I used the screwdriver and was able to

2    open the trunk box.

3    Q.   Okay.  What did you find out when you -- what did you see

4    when you opened the trunk?

5    A.   There was a small, soft gun case.  There was the butt of two

6    pistols inside that you could see inside that case.

7    Q.   The butts of two pistols sticking out of the gun case?

8    A.   Yes, sir.

9    Q.   And did you look at the pistols at some point?

10   A.   Yes, sir, we did.

11   Q.   And was one of them blown up?

12   A.   Yeah, it was like a -- the cylinder had exploded.

13   Q.   Okay.

14   A.   It was heavily damaged.

15   Q.   Okay.  And the other pistol, was it in fairly decent shape?

16   A.   It was in good condition.

17   Q.   Okay.  So two pistols in there, one of them was damaged and

18   one of them was -- looked to be functional?

19   A.   Yes, sir.

20   Q.   All right.  Now, did you arrest Mr. Carroll that evening?

21   A.   No, sir.

22   Q.   All right.  Was Mr. Carroll arrested?

23   A.   Yes, he was.

24   Q.   Who was he arrested by?

25   A.   ATF Agent Sanchez.

Herring - Direct

1    Q.   Okay.  Did you subsequently learn about the -- that trike or

2    bike being stolen?

3    A.   I did.

4    Q.   What do you know about that?

5    A.   The victim of that, when contacted, said that the bike had

6    been stolen from her.  I'd have to look at the date.

7    Q.   That's fine.

8    A.   Recently, but she did not report it stolen at the time

9    because she didn't have a VIN, or title, or registration.  She

10   didn't know of that information, so she did not report it

11   stolen.

12   Q.   Okay.  Has it been reported stolen at this point?

13   A.   Yes, it has.

14   Q.   Okay.  So that report's been filed?

15   A.   Yes, sir.

16   Q.   All right.  Were the firearms that were in the trunk of this

17   trike -- you say the butts of the firearms were visible when you

18   opened the door?

19   A.   Yes, sir.

20   Q.   Okay.  You didn't have to rummage around to find them or

21   anything like that?

22   A.   Correct.

23        MR. DYKE:  Okay.  All right.  I believe that's all the

24   questions I have for you right now, if you'll answer defense

25   counsel's questions.

1          THE WITNESS:  Yes, sir.

2                          CROSS-EXAMINATION

3      BY MR. WILLIAMS:

4      Q.   Detective Herring --

5      A.   Yes, sir.

6      Q.   -- on page 2 -- on page 2 of the complaint, beginning at the

7      very top, it reads:  "During the search of the residence, James

8      Carroll was located and identified by Detective Herring as the

9      individual who accessed the rear storage compartment of the

10     motorcycle."  And then you say that Carroll and Whitaker gave

11     ATF Special Agent Matthew Johnson and Detective Herring consent

12     to look inside the compartment of the motorcycle.

13          Now, if I understand your testimony, the motorcycle did not

14     belong to my client, nor did it belong to Mr. Whitaker.

15     A.   Yes, sir.

16     Q.   Is that correct?

17     A.   Yes, sir.

18     Q.   Did you determine why the motorcycle was there or how the

19     motorcycle got at that location?

20     A.   Yes, sir.  I believe Mr. Carroll was the one that said that

21     he had -- I don't recall if he rode it there.  He said he was

22     working on it for someone that he knew and had ridden it on the

23     street a couple of times.

24     Q.   I'm sorry.  Now, what was that?  On the street?

25     A.   He had ridden the motorcycle on the street right there in

Herring - Cross

1    front of the house.

2    Q.   Okay.  So --

3    A.   Because he was supposed to be doing some work on it.

4    Q.   Right.  Okay.  So my client told you that he was working on

5    or had worked on the motorcycle?

6    A.   Yes, sir.

7    Q.   Right?  And did you gather any evidence to dispute that?

8    A.   I'm not sure what you're asking me, sir.

9    Q.   Well, he said he was working on the motorcycle.

10   A.   Yes, sir.

11   Q.   Or did you say he was working on it or he had worked on the

12   motorcycle?

13   A.   I'm not sure.  I just -- I just knew that he had the

14   motorcycle and he was supposed to be doing some work on it.  I

15   don't know what that work entails or what he had done or not

16   done.

17   Q.   Okay.  Did you determine when and how the motorcycle arrived

18   or got to that location?

19   A.   No, sir.  I don't know exactly when or how it got there.

20   Q.   Okay.  Do you know how long the motorcycle had been at that

21   location?

22   A.   No, sir.

23   Q.   Did you inquire of Mr. Whitaker about the motorcycle?

24   A.   I believe I asked him whose it was, and he said he didn't

25   know.

Herring - Cross

1    Q.   He said he didn't know?

2    A.   Right.  I believe he said that Mr. Carroll had it at some

3    point.

4    Q.   You believe he said that Mr. Harrell --

5    A.   Mr. Carroll, yes, sir.

6    Q.   -- Mr. Carroll had the motorcycle at some point?

7    A.   Yes, sir.

8    Q.   Now, when you say "some point," are we talking about some

9    point that day or some point prior to that day?

10   A.   It was my understanding that it was that day.

11   Q.   That it was that day?

12   A.   He didn't say that specifically, but that's how I took his

13   statement.

14   Q.   Okay.  He did not say that specifically --

15   A.   No, sir.

16   Q.   -- but that's the conclusion that you drew --

17   A.   Yes, sir.

18   Q.   -- is that it had gotten there that day?

19   A.   I don't know if I -- I don't know when it got there exactly,

20   but when I asked if he knew whose motorcycle it was, he led me

21   to believe that Mr. Carroll had brought it there.

22   Q.   Okay.  Now, you say Mr. Whitaker -- I just want to make sure

23   I understand.

24   A.   Yes, sir.

25   Q.   Mr. Whitaker told you or Mr. Whitaker wanted you to know or

Herring - Cross

1    believe that Mr. Carroll had brought it there that day?

2    A.   I don't want to put words into his mouth, but, essentially,

3    when I asked if he knew who owned that motorcycle, he said no.

4    He just said that at some point Mr. Carroll had possession of

5    it.

6    Q.   At some point Mr. Carroll got possession of the motorcycle?

7    A.   Yes, sir.

8    Q.   Now, was the point that Mr. Carroll got possession of the

9    motorcycle at that location or at some other location?

10   A.   I'm not sure, sir.

11   Q.   Does any of your fellow officers or agents have information

12   that would establish when that motorcycle arrived at that

13   location?

14   A.   No, sir.

15   Q.   They don't have that information?

16   A.   No, sir.

17   Q.   All right.  Would any of your fellow officers or agents know

18   how it arrived at that location?

19   A.   No, sir.

20   Q.   Did any of your fellow officers or anyone related to the

21   investigatory bodies, or wherever -- wherever that -- whoever

22   that may be check the motorcycle to see if the motorcycle

23   worked?

24   A.   No, sir.

25   Q.   Okay.  Where's the motorcycle now?

1    A.   It's missing again, sir.

2    Q.   When you say it's missing again, are you saying that it was

3    taken in as evidence and someone stole it or it was simply left

4    there?

5    A.   It was left there, sir, because it was not confirmed as

6    stolen at the time.

7    Q.   I'm sorry.  It was not what?

8    A.   It was not confirmed stolen at the time.

9    Q.   It was not confirmed stolen at the time, so you left it

10   there.  And in leaving it there -- strike that.

11        And, of course, we can assume -- "we" being Mr. Dyke, and

12   myself, and Her Honor -- that neither you, nor anyone connected

13   with the investigators, did a check on the motorcycle to see if

14   it was operative?

15   A.   Correct.

16   Q.   Okay.  Nor did any of you do any investigation that would or

17   could dispute Mr. Carroll's, if he in fact claimed -- and I

18   understand from your testimony that he's supposed to have been

19   working on the motorcycle -- dispute that he actually had worked

20   on the motorcycle?

21   A.   Correct, sir.

22   Q.   Right.  You can't dispute it, can you?

23   A.   No, I don't know what work has been done on that.

24   Q.   Now, what time did you arrive at the location?

25   A.   I don't know the exact -- the exact time, sir.  I would

Herring - Cross

1    guess somewhere around 4:45 or maybe before that.

2    Q.   Sometime around 4:35?

3    A.   4:45.

4    Q.   4:45, okay.  You arrived there around 4:45.  And that's

5    p.m.; right?

6    A.   Yes, sir.

7    Q.   All right.  Now, as I understand it, Special Agent

8    Jennifer -- what was her last name?

9    A.   Ockerman.

10   Q.   -- Ockerman, Special Agent Jennifer Ockerman told you that

11   she had gotten the tip?

12   A.   Yes, sir.

13   Q.   Okay.  I take it she called you on the phone or something of

14   that nature; right?

15   A.   Yes, sir.

16   Q.   And the tip was that there were going to be some guns picked

17   up, or traded, or transferred between individuals at that

18   location.

19   A.   I wouldn't -- I can't speak to the exact tip, because I

20   don't know, but it was told to me that they were being -- they

21   were in the attic and they were being moved.

22   Q.   I'm sorry?  That they were in the house?

23   A.   That the guns were in the house in the attic and they were

24   being moved.

25   Q.   That the guns were in the house in the attic, and they were

Herring - Cross

1    going to -- they were going to be or they were being moved?

2    A.  Just that they were being moved.

3    Q.  They were being moved.  As in being moved at that moment?

4    A.  That's the way it was presented to me.

5    Q.  Okay.  Now, in the complaint, you state -- you swore the

6    complaint; right?

7    A.  No, sir.

8    Q.  Okay.  You state that the -- okay.  And I quote, "Louisville

9    Metro Police Department Detective Johnson and Herring set up

10   surveillance on the residence and observed an individual"

11   [inaudible].  Now, so prior to your setting up surveillance on

12   the residence, the residence had not -- the resident -- or the

13   residence had not been under surveillance; is that correct?

14   A.  There had been surveillance by Officer Manning.

15   Q.  Officer whom?

16   A.  Mark Manning.

17   Q.  I'm sorry.  And believe it or not, I have my hearing aids

18   on, but every time I come to this courtroom, they just don't

19   quite work.

20   A.  Yes, sir, Officer Mark Manning.

21   Q.  Mark Manning?

22   A.  Yes, sir.

23   Q.  Mark Manning himself had surveillance of the residence?

24   A.  Yes, sir.

25   Q.  Was it that same day?

Herring - Cross

1    A.  Yes, sir.

2    Q.  Okay.  Very good.  Was Officer Mark Manning there when you

3    arrived and began your surveillance?

4    A.  He had left that -- wherever he was doing surveillance, he

5    had left to conduct the traffic stop.

6    Q.  Okay.  Now, when or what time, rather, did Officer Manning

7    set up his surveillance?

8    A.  I'm not exactly sure, sir.  I'd have to check with the CAD

9    history.

10   Q.  You have to check where?

11   A.  With the computer to see exactly when he said -- he called

12   off on the radio.

13   Q.  Okay.  He called the radio?

14   A.  Using his police radio, he stated that he was -- he had eyes

15   on the house.

16   Q.  Okay.  Now, do you know -- when he placed that call on his

17   radio, to whom did he place that call?

18   A.  It was just general air traffic on the radio.

19   Q.  General air traffic to -- is that LMPD radio transmission?

20   A.  Yes, sir.

21   Q.  Okay.  So we have a record of that, won't we?

22   A.  Yes, sir.

23   Q.  Okay.  Now, it's already been [inaudible] can you give us a

24   range -- can you give the court a range of when Officer Manning

25   set up his surveillance?

Herring - Cross

1    A.   It was after -- it was after I had received the phone call

2    from Agent Ockerman.  So it was very quick, fluid --

3    Q.   All right.  Okay, okay.  And, of course, you received it, I

4    think you have said, somewhere in the neighborhood of 4:00 or

5    so?

6    A.   Around 4:15, yes, sir.

7    Q.   So it was a short time before that where Officer Manning did

8    his surveillance?

9    A.   No, it was after that.

10   Q.   After -- oh, after you received that call?

11   A.   Yes, sir.

12   Q.   Do you know what Officer Manning saw during his

13   surveillance?

14   A.   I can't answer that question.

15   Q.   Do you know if he saw any individuals at the location?

16   A.   I can't answer that question.  I just know that he observed

17   that car leave that residence that they did a traffic stop on.

18   Q.   Okay.  Now, so the only thing you know is that he saw that

19   car, as far as surveillance is concerned, leave that residence

20   and he made a traffic stop on that car?

21   A.   Yes, sir, with --

22   Q.   Now, who was in that automobile?

23   A.   I don't know, sir.  I wasn't over there.

24   Q.   I'm sorry?

25   A.   I never made it to that traffic stop, so I don't know who

Herring - Cross

1   was in that car.

2   Q.  Well, was it one person or two persons?

3   A.  I believe it was two, but I can't say for sure.

4   Q.  Okay.  Do you know the gender of those persons?

5   A.  No, sir.

6   Q.  Well, I presume that that vehicle was searched at some

7   point.

8   A.  Yes, sir.

9   Q.  Right?  Now, do you know what, if anything, was found during

10   the search of that automobile?

11   A.  I don't know for sure, because I wasn't there for that

12   search.

13   Q.  You don't know whether anything was found at all?

14   A.  I believe a gun was found either on one of the persons or in

15   the vehicle, but I can't say which.

16   Q.  Well, a gun was found on one of the persons.  Now, do --

17   now, as I understand your testimony, this place -- the Summer

18   building or Sumner building?

19   A.  His name is Winfred Sumner.

20   Q.  Uh-huh.

21   A.  But he goes by Biff.

22   Q.  By what?

23   A.  "Biff."

24   Q.  Biff, okay.  So it was Biff's building.  You say over a

25   thousand guns?

Herring - Cross

1   A.   We don't know the exact number.

2   Q.   Okay.  Is it a building or is it a commercial establishment?

3   A.   It's a building that he privately owns.

4   Q.   It's a building that keeps privately-owned guns?

5   A.   He uses it for storage of a lot of stuff and the upstairs is

6   all guns.  Sorry.

7   Q.   Okay.  Now, is Biff in the business of -- what's his

8   business?

9   A.   He is -- he had an FFL license and he sold firearms.

10  Q.   He sold firearms?

11  A.   Yes, sir.

12  Q.   Okay.  But it's in a building that he owns and [inaudible]?

13  A.   That was separate from his gun store.  This is --

14  Q.   Separate from his gun store?

15  A.   Yes, sir.  He said this is his private collection of

16  firearms.

17  Q.   Oh, his private collection of firearms.  And those firearms

18  were stolen back in -- when did you say?

19  A.   In August, sir.

20  Q.   Been a while back; right?  But you had -- correct me if I'm

21  wrong, but I thought you said that you had -- when I say "you,"

22  I'm speaking collectively now.  I'm speaking of the police and

23  speaking of ATF agents, speaking of FBI, anybody else who might

24  have been involved in the investigation of over a thousand

25  firearms in this community.  Naturally, that would give the

Herring - Cross

1    agents grave and great concern.

2        Now, so you had several suspects; correct?

3    A.   Yes, sir.

4    Q.   Now, let's see.  When was that -- when were the guns stolen?

5    You say back in -- when was that from Biff?

6    A.   I'd have to look from my actual report.  I don't have it in

7    front of me, sir, but it was -- it was at the end of August.

8    Q.   August sometime, August/September.  Now, if I'm saying it

9    correct, there were several suspects?

10   A.   Yes, sir.

11   Q.   Right?  And were these -- strike that.  Were you the one

12   leading the investigation?

13   A.   I'm leading the investigation of the burglary.

14   Q.   The burglary of Biff's?

15   A.   Of the building, yes, sir.

16   Q.   Right?  Now -- and you had a list of suspects; right?

17   A.   It's an ongoing investigation still, sir.

18   Q.   I understand that.  Believe me, I understand that.  You

19   haven't found those guns, have you?

20   A.   There's a lot.

21   Q.   Right.  Now, you have a number of suspects; right?

22   A.   Yes, sir.

23   Q.   Was my client one of those suspects?

24   A.   He's been named in my investigation, yes, sir.

25   Q.   He was named early on; is that correct?

Herring - Cross

1    A.  Yes, sir.

2    Q.  All right.  Now, and that being -- that being the case --

3    well, strike that.

4        Now, I would take it that you and your -- the team of

5    investigators -- I'm correct there was a team of investigators;

6    correct?

7    A.  I've had a lot of help on this.

8    Q.  Right, now that you had been following and surveilling

9    various locations, these suspects.

10   A.  As best --

11   Q.  Correct?

12   A.  As best we can, yes, sir.

13   Q.  Yes, as best you can.  Now, when did you become aware that

14   my client was one of those suspects?

15   A.  I can't -- I'm not sure the exact date, but he's been

16   brought up in several interviews that we've conducted.

17   Q.  Was it near or far from the date of his arrest on

18   October 3rd?

19   A.  It was -- it was pretty early on in the investigation.

20   Q.  Pretty early on.  Now -- and you knew where he lived;

21   correct?

22   A.  No, sir.

23   Q.  You did not know where he lived?

24   A.  No, sir.

25   Q.  Now, wait a minute.  I'm not being facetious or nothing now.

1    With all the resources that we have in this, you didn't know

2    where he lived?

3    A.   No, sir.

4    Q.   Did you go to -- strike that.  I don't guess that's very

5    relevant anyhow.

6         Special Agent Ockerman got you this tip the guns were going

7    to be moved at this location, but yet you found no guns, except

8    the gun in the motorcycle trunk compartment?

9    A.   Yes, sir.

10   Q.   Arrested nobody but my client?

11   A.   As far as I know, yes, sir.

12   Q.   Right.  And Mr. Whitaker, who owns the property -- right?

13   No question about that; right?

14   A.   Correct.

15   Q.   Okay.  Was he charged?

16   A.   No, sir.

17   Q.   Is he a suspect in this investigation?

18   A.   He's been named and guns have --

19   Q.   He's been named as a suspect.  And I will take it he's been

20   named as a suspect for some time; is that right?

21   A.   And I don't believe he's been named as going into the

22   building itself, but a lot of information has said that guns

23   have gone into his house.

24   Q.   Right.  Now -- and you said you've been to his house before.

25   A.   Yes, sir.

1   Q.   You're familiar with his house?

2   A.   Yes, sir.

3   Q.   Explain that to how -- why had you been there before and

4   what did you find?

5   A.   On other investigations --

6        MR. DYKE:   I'm going to object on the grounds of

7   relevance.   I don't know why -- how it's relevant that he had

8   been in this house before this break-in occurred, so I'm

9   objecting on the grounds of relevance.

10        MR. WILLIAMS:   I tell you, Judge, it's very relevant.

11   It's quite relevant, as a matter of fact.   I wish I could -- I

12   could find my research in my limited time that I had when it

13   talks about -- I mean, this is a probable cause hearing.   And

14   under Federal Criminal Rule 59(d), I think, you want to -- the

15   court wants to determine -- pardon me, Your Honor.   I need --

16   let's see.

17      Of course, now I got part of it.   Let me just see here.   Let

18   me just see here.   Detention and probable cause hearing, you

19   want to determine -- it's an adversary proceeding, of course,

20   and the court wants to determine if there is probable cause for

21   charging an individual.

22      And I believe it is very relevant if the -- and that case

23   that I had, Judge -- unfortunately, I've misplaced it -- talks

24   about fairness to the accused.   And I cannot understand how --

25   what could be more relevant as to fairness to the accused if the

Herring - Cross

```
 1    owner of the property itself, if the property on which the
 2    motorcycle was found, the property on which the stolen --
 3    presumably stolen -- I guess these are some guns stolen from
 4    somewhere -- was found.  Okay?  He's not charged.  There's no
 5    explanation for why he -- I mean, so --
 6              THE COURT:  Well, you have that information in the
 7    record, so it will -- it certainly would be considered by the
 8    court.
 9              MR. WILLIAMS:  Thank you.
10    BY MR. WILLIAMS:
11    Q.  Now, we know you were there on this day that my client was
12    arrested.  We know you had been there on a previous occasion.
13    Right?
14    A.  Yes, sir.
15    Q.  When was that?
16    A.  At the beginning of this investigation, I went to --
17    Q.  At the beginning you had gone there.  So at the very
18    beginning -- and I presume, correct me if I'm wrong, that
19    Mr. Whitaker was presumed to be involved in this -- the
20    disposition of these guns.
21    A.  At the time it was very -- it was at the very beginning,
22    sir.
23    Q.  Right, right, right.
24    A.  At the time when I was at the house prior, I didn't even
25    know that the burglary had occurred yet.
```

Herring - Cross

1   Q.   I'm sorry?

2   A.   I did not even know that the burglary had occurred yet.

3   Q.   At the time you were where?

4   A.   At Mr. Whitaker's.

5   Q.   The previous?

6   A.   Correct.

7   Q.   Well, may I ask, why were you there?

8   A.   Sure, and it's from another case.  There's been two other

9   times that I've been there.

10  Q.   Another case.  I believe -- where were those cases?

11  A.   One was on a stolen phone that had --

12  Q.   Stolen phone?

13  A.   -- that had been tracked to that address.

14  Q.   Okay.  Tracked to that address.

15  A.   Yes, sir, and was recovered there.

16  Q.   It was recovered there?

17  A.   Yes, sir.

18  Q.   Okay.  Who was it recovered from?

19  A.   It was in the backyard.

20  Q.   It was in the backyard.

21  A.   Yes, sir.

22  Q.   Just lying out there in the backyard?

23  A.   Yes, sir.

24  Q.   When you recovered it there, who was present?

25  A.   There were several people there that day.

Herring - Cross

1    Q.  Several people.  Were those people who were present some of

2    the same folk whom your tipster told you were going to be

3    present or present during this transaction on October 3rd?

4    A.  Those are two totally unrelated cases.

5    Q.  Two totally different.  So you were investigating a stolen

6    telephone?

7    A.  This was several months ago, yes, sir.

8    Q.  Yeah.  You were investigating a stolen telephone.

9    A.  Yes, sir.

10   Q.  Whose phone was it?

11   A.  I couldn't -- I don't remember his name, sir.  It was a

12   report that I was assigned to as a detective.

13   Q.  Okay.  Of course, you have a record of that case, and we

14   would be able to discover who that was.  Could it have been

15   someone who was suspected of having been connected with the

16   theft of these firearms?

17   A.  I don't believe so.

18   Q.  Now, so that's two occasions.  Had you been there on some

19   other occasion?

20   A.  Yes, sir.  At the beginning of this, we were told by someone

21   that had a gun -- a felon was stopped by a patrol officer and

22   said that he had been in that house on Ashlawn with what -- he

23   had witnessed a bunch of people with a lot of guns inside of

24   that house.

25   Q.  Okay.  This time who was that fellow?

1    A.   Am I allowed to say that?

2    Q.   Now, it was a stolen gun?

3    A.   No, sir, not at the time.

4    Q.   Wait a minute.  Oh, you stopped the felon?

5    A.   I did not stop him.

6    Q.   Someone -- when I say you, I'm speaking collectively.  I'm

7    speaking about the police.  And when I say the police, I'm

8    talking about the LMPD, the county police, ATF, the FBI, the

9    Secret Service, anybody connected with the police.  Okay?  Just

10   so that there's no confusion.

11   A.   Yes, sir.

12   Q.   But someone stopped an individual with a stolen gun?

13   A.   He was never charged with a stolen gun.  He was a convicted

14   felon in possession of a handgun.

15   Q.   Right, right, right.  So here someone was stopped.

16   A.   Yes, sir.

17   Q.   And this person who was stopped was a convicted felon.

18   A.   Yes, sir.

19   Q.   And he had a firearm?

20   A.   Yes, sir.

21   Q.   Okay.  And I take it that he was prosecuted for having a

22   firearm that was found on him that day?

23   A.   He was charged and that's -- that's still ongoing.

24   Q.   He was charged?

25   A.   Yes, sir.  It's still pending in court, I believe.

1   Q.   It's still pending in this court or a state court?

2   A.   It's not my case, sir.  I'm not sure where it is.

3   Q.   What's the felon's name?

4   A.   Am I allowed to say that?

5   Q.   I'm sorry?

6          MR. DYKE:  There is an objection.  I mean, we're going

7   too far afield here, the fact that someone may have been charged

8   with one of a thousand guns that may have been stolen or seen at

9   this house.  What we're here about is this -- looking into the

10  trunk of this trike on October 3rd and whether or not there's

11  probable cause to believe that Mr. Carroll possessed the two

12  firearms that were in the trunk, either one of them.  That's all

13  we're here for, not someone who may have been charged a month

14  before.

15         MR. WILLIAMS:  Your Honor, I would understand -- if I

16  were over there where Mr. Dyke is, I would want to limit this as

17  well, but, unfortunately, hey, that is not the case now.  I'm

18  sorry.  I can't find that case.

19    But, Judge, it's -- we could brief the issue.  Okay?  And he

20  opened the door to all of this.  Okay?  Now --

21         THE COURT:  Well, it's correct that we are here on a

22  probable cause hearing with respect to the criminal complaint

23  that's before the court now.  We're not here to address issues

24  of other arrests, other prosecutions, other charges, other than

25  those that are in this complaint.

Herring - Cross

1           MR. WILLIAMS:  And, Judge, and I realize that I've

2     said that that kind of, you know, motion and so forth

3     [inaudible] was obviously filed, okay, for another setting and

4     another court.  Okay?  But we're talking relevancy here and

5     we're talking about what is the reality, because I'm going to

6     argue -- I'm going to argue, Judge, that this document right

7     here and all that it alleges, okay --

8           THE COURT:  Well, let's save that.  Let's save your

9     argument for your completion of your questions of this witness.

10          MR. WILLIAMS:  Okay.  All right, all right.

11    BY MR. WILLIAMS:

12    Q.  Now, so we have -- we have the traffic stop on the day that

13    my client was arrested.  Two people were in that car.  We

14    have -- you're going to this location over a stolen telephone

15    that was found in the backyard.  So we have an individual having

16    been stopped at some other time --

17          THE COURT:  Is there a question?

18          MR. WILLIAMS:  Yes, ma'am.

19    BY MR. WILLIAMS:

20    Q.  Now, did you go to that house on some other occasion?

21    A.  Yes, sir.

22    Q.  Okay.  What occasion was that, sir, and when?

23    A.  After I did an interview with that subject who was stopped,

24    a felon in possession of a handgun --

25    Q.  Yes, sir.

1    A.  -- who gave me a statement saying that he had seen a bunch

2    of guns and narcotics inside of that house recently, so I went

3    and just did a knock and talk at that house.

4    Q.  Okay.  Now, did this felon that you stopped, did he know the

5    names of any of these people?

6    A.  He didn't -- no, it's not somewhere that he said he

7    frequented.  He just was there one day and saw a bunch --

8    Q.  He was there just one day.  Did he say my client was there

9    among all those people that were there?

10   A.  Not that I recall.

11   Q.  Do you -- and prior to this day, did you have any

12   information from anybody that my client was involved in the

13   transactions involving or coming out that occurred around that

14   house?

15   A.  On which day, sir?

16   Q.  On any day.

17   A.  Mr. Carroll's name has been brought up in interviews that

18   we've done with subjects prior to the --

19   Q.  Okay.

20   A.  -- October 3rd.

21   Q.  All right.  So have been brought up in interviews that you

22   had.  So there were other interviews that you had?

23   A.  Yes, sir, there's been a lot of interviews.

24   Q.  I'm sorry?

25   A.  There's been a lot, sir.

1    Q.   How many other interviews has it come up in?

2              MR. DYKE:  Your Honor, I'm going to object.

3              MR. WILLIAMS:  I'll withdraw that, Judge.  I'll

4    withdraw that question.

5    BY MR. WILLIAMS:

6    Q.   Okay.  Again, I want to get back to Mr. Whitaker.  He owned

7    the property.  The tricycle/motorcycle/bicycle, whatever it was,

8    was on his property.  Do you know what time of the day that my

9    client arrived at Mr. Whitaker's property?

10   A.   No, sir.

11   Q.   Where the motorcycle was located?

12   A.   No, sir.

13   Q.   Do you know by what mode of transportation that my client

14   arrived at Mr. Whitaker's house?

15   A.   No, sir.

16   Q.   Does anyone on your team have an answer to those questions

17   that I just put to you?

18   A.   No, sir.

19   Q.   Now, prior to -- strike that.  Now, so he came -- my client

20   came out of the side door of the house and went to the

21   motorcycle, okay, and he opened it.  Did you see him opening it?

22   A.   I saw it opened, yes, sir.

23   Q.   Now, did you see how he opened it?

24   A.   I couldn't see from -- he had his back to me.

25   Q.   Okay.

Herring - Cross

1    A.  And he was blocking any sort of view that I had of that.

2    Q.  I believe you said that someone said you have -- it takes a

3    screwdriver to open it?

4    A.  Yes, sir.

5    Q.  Who told you that?

6    A.  He did, sir.

7    Q.  He told you; right?

8    A.  Yes, sir.

9    Q.  When you were in the house; right?

10   A.  I believe it was when we were outside.

11   Q.  When you were -- oh, when you were outside?

12   A.  Yes, sir.

13   Q.  Oh, you said when you were outside.  You went in.  He was in

14   the room, and then you -- y'all went out.  The two of you went

15   outside.

16   A.  Initially he was in the living room on the chair, and then

17   we went outside as well after that.

18   Q.  Okay.  And you went outside after that and then he opened

19   it?

20   A.  I saw the motorcycle when we came back outside, and that's

21   when I wanted to investigate the motorcycle and make sure --

22   confirm that it wasn't stolen and was looking at the motorcycle.

23   Q.  Okay.  But you say he told you you needed a screwdriver to

24   open it?

25   A.  Yes, sir.  He was standing outside when we were standing

Herring - Cross

1   outside as well.

2   Q.  Okay.  So --

3   A.  And I asked him how to open it.  He said, "You need a

4   screwdriver to open it."

5   Q.  Okay.  And did you get a screwdriver to open it?

6   A.  Yes, sir.

7   Q.  All right.  Now, and you surveilled him from the church

8   parking lot or property?

9   A.  Yes, sir.

10  Q.  Right.  And how far away was that would you estimate?

11  A.  It's less than 100 yards, I would guess.

12  Q.  Less than 100 yards.  Okay.  Could you see from that

13  instance how he opened the compartment?

14  A.  No, sir.

15  Q.  Okay.  Because you did say that -- in your complaint that

16  you saw this individual go to the compartment of the motorcycle

17  and open it.

18  A.  Yes, sir.

19  Q.  And looked inside.  All right.  Now, did my client give you

20  a statement as to his version of events?

21  A.  Yes, sir, we did a formal interview with him at Third

22  Division.

23  Q.  What did he tell you?

24  A.  It was a lot, sir.

25  Q.  I'm sorry?

1  A.  He gave us a long interview, sir.

2  Q.  Well, I mean, I'm not being sarcastic here, but I got all

3  the time in the world.  But, of course, I'm not running the

4  court.  Tell us what he told you.

5          MR. DYKE:  Judge, can we at least limit it to

6  information relating to the firearm that was found in the trunk?

7          THE COURT:  Yes, if you can answer the question with

8  respect to the firearm, because we're limited to the charge in

9  the complaint.

10  BY MR. WILLIAMS:

11  Q.  The firearm in the motorcycle.

12  A.  Yes, sir, he did not claim ownership of those.

13  Q.  No, I mean, tell what he -- what did he tell you?

14  A.  He told me that he had seen -- when he opened the trunk, he

15  saw the gun in there.  I think he said "the gun."  He said when

16  he saw that, he didn't want anything to do with it.  He shut the

17  trunk and went back inside.

18  Q.  And did -- he also told you that he was going to be or had

19  been asked to work on the motorcycle, didn't he?

20  A.  Yes, sir.

21  Q.  And he also told you, didn't he, that a lady inside said to

22  him, "Before you go out there and work on that gun, you better

23  see what's in that compartment."  He told you that too, didn't

24  he?

25  A.  I don't remember that part, sir.

1  Q.  But you don't -- you can't dispute or deny that, can you?

2  A.  No, sir.

3  Q.  Who was that lady?

4  A.  Sir, I don't know what lady you're referring to.

5  Q.  He gave you a name, didn't he?

6  A.  If he did, I don't recall.

7  Q.  And he gave you several names, didn't he?

8  A.  About the burglary, yes, sir.

9  Q.  He gave you several names on that day that you arrested him,

10  didn't he?

11  A.  Yes, sir, he said names.

12  Q.  Did you follow up on any of the things that he told you to

13  confirm or disaffirm what he told you?

14         MR. DYKE:  Objection, within -- if it's something that

15  has to do with the gun in the trunk of the motorcycle, Judge, I

16  don't have any objection to it.

17         MR. WILLIAMS:  Judge, that's why we're here, the gun.

18  That's the only reason why we're here.

19         THE COURT:  Right.  If your question can be limited to

20  that.  Your question was much broader than that.

21         MR. WILLIAMS:  I'm sorry?

22         THE COURT:  Your question was much broader than that.

23         MR. WILLIAMS:  Well, it had to do, Judge, with

24  probable cause and probable cause as to what probable cause did

25  he have for arresting him, for going to the motorcycle, the

Herring - Cross

1    probable cause for -- and the motorcycle that he didn't own and

2    apparently that Whitaker didn't own.  I just don't know, Judge.

3    That's --

4              THE COURT:  Well, it sounds like you're making your

5    argument with respect to those issues.

6              MR. WILLIAMS:  Okay.  All right.

7    BY MR. WILLIAMS:

8    Q.  Now, who was the lady that came out of the house and came

9    over into the field where you were?  Who was that?

10   A.  I believe her name is Hope, Hope Green.

11   Q.  I'm sorry?

12   A.  I believe her name is Hope Green.

13   Q.  Hope Green.  Now, was Hope Green placed under arrest?

14   A.  No, sir.

15   Q.  When you went to the house, was Hope Green there?

16   A.  No, we had detained her until we went to the house and she

17   was released.

18   Q.  And then she was released.  Did you -- I presume you took a

19   statement from her; right?

20   A.  I was only asking her questions about who was inside the

21   house.

22   Q.  Oh, and you --

23   A.  I didn't give her any sort of formal interview.

24   Q.  You didn't ask her if she was there to buy guns?

25   A.  No, sir.

Herring - Cross

1    Q.  You didn't ask her if she had brought guns there?

2    A.  No, sir.

3    Q.  You didn't ask her if anybody came with her earlier --

4    A.  I did ask her if there was guns in the house, and she said

5    she didn't think so.

6    Q.  She said she did not think so?

7    A.  Correct.

8    Q.  Now, this Hope Green, I take it you, of course, took her

9    address, didn't you?

10   A.  She's homeless, sir.

11   Q.  I'm sorry?

12   A.  She's homeless.

13   Q.  She's homeless.  You don't know how to reach her or get in

14   touch with her?

15   A.  No, sir.

16   Q.  Now, you took her word, said -- she said she didn't know

17   anything about any guns?

18   A.  I --

19   Q.  What did she tell you?

20   A.  I'm sorry, sir?

21   Q.  I don't understand.  What did she --

22        MR. DYKE:  I'm going to object, Your Honor, unless it

23   has something to do with that gun.

24        MR. WILLIAMS:  Okay.  Let me try this one, Mr. Dyke.

25   BY MR. WILLIAMS:

Herring - Cross

1    Q.   Did ask you her one question about the guns?

2    A.   I asked her if there were guns in the house.

3    Q.   And you said -- and that's all you asked her?

4    A.   That's as far as I can recall.

5    Q.   As far as you can recall?

6    A.   Yes, sir.

7    Q.   Is there guns in the house?

8    A.   Yes, sir.

9    Q.   And with that you let her go?

10   A.   At the time, yes, sir.

11   Q.   At the time?

12   A.   I had no reason to hold her.

13   Q.   At the time, okay.  You had no reason to hold her.  Now, you

14   have not a clue where this lady went and where she is today?

15   A.   No, sir.

16   Q.   And if it were to be discovered later on that she had gone

17   in and burglarized this place, all right, you can't find her?

18   A.   We would be able to find her at some point.

19   Q.   You would be able to find her, wouldn't you?

20   A.   I believe so, yes, sir.

21   Q.   I thought so.  Thank you.

22        Now, my client told you that the motorcycle -- or he had

23   been told that the motorcycle belonged to Cosmos?

24   A.   Correct.

25   Q.   And we did -- I think I established this.  If I didn't,

1 that's just -- he told you that he was working on it for Cosmo

2 or Cosmos had asked him to work on it; isn't that true?

3 A.  Yes, sir.

4 Q.  He also told you that that's why he went out there to check

5 the motorcycle, to see if a blow up gun was there, didn't he?

6 A.  Sir, he told me he was there to check on Mr. Whitaker.

7   MR. WILLIAMS:  Your Honor, give me a moment to check

8 with my client, please.

9  (Off the record.)

10   THE COURT:  We're back on the record.

11   MR. WILLIAMS:  I'm sorry, Judge.

12 BY MR. WILLIAMS:

13 Q.  Isn't it true that my client, in explaining why you were

14 there -- why he was there, that he had gone there to check on

15 Mr. Whitaker because Mr. Whitaker had gotten robbed?

16 A.  Yes, sir.

17 Q.  And when he went there to check on Mr. Whitaker, he got to

18 the house, Cosmos was there.  And while there, Cosmos asked him

19 to work on his motorcycle?

20 A.  I don't remember that part.

21 Q.  You don't deny it, do you?

22 A.  I can't answer that, sir.  I don't recall him saying that

23 Cosmos --

24 Q.  I'm sorry?

25 A.  I don't remember him saying Cosmos was there that day, sir.

Herring - Redirect

1   Q.  I thought you said he gave you the name Cosmos on your

2   direct.

3   A.  I'm sorry?

4   Q.  I thought you -- you said something about Cosmos on your

5   direct examination from Mr. Dyke.

6   A.  He said that he had been asked to work on the bike by

7   Cosmos, but I don't know when that conversation or where that

8   conversation occurred.

9          MR. WILLIAMS:  Your Honor, that's all I have.

10          THE COURT:  All right.  Redirect?

11          MR. DYKE:  Just a couple questions, Judge, just to

12   clear something up.

13                      REDIRECT EXAMINATION

14   BY MR. DYKE:

15   Q.  Detective Herring, when you opened the trunk of the

16   motorcycle, you indicated that there was a -- well, can you

17   describe how these -- again, how these firearms are situated?

18   A.  They were in a -- like a soft case, a pistol carrying case

19   that wasn't fully closed, and you could see the handles of the

20   firearms.

21   Q.  Okay.  Just the grip or the handle?

22   A.  Yes, sir.

23   Q.  All right.  Could you tell that -- from looking at it, the

24   way you found it, that one of them had been blown up?

25   A.  No.

Sanchez - Direct

```
 1   Q.  Okay.  You had to open up the case to see if it had been

 2   blown up?

 3   A.  Correct.

 4           MR. DYKE:  All right.  That's all the questions I

 5   have.  Thank you.

 6           THE COURT:  Okay.  If there are no further

 7   questions --

 8           MR. WILLIAMS:  Nothing further.

 9           THE WITNESS:  Thank you.

10           THE COURT:  You may step down.  Thank you.

11           MR. DYKE:  I'm going to call Alex Sanchez to the

12   stand, Your Honor.

13           DEPUTY CLERK:  Please raise your right hand.

14      (SPECIAL AGENT ALEXANDER SANCHEZ, called by the Government,

15   sworn.)

16                       DIRECT EXAMINATION

17   BY MR. DYKE:

18   Q.  Can you tell us your name, please.

19   A.  It's going to be Alexander Sanchez.

20   Q.  How are you employed?

21   A.  I'm with ATF, Bureau of Alcohol, Tobacco, Firearms, and

22   Explosives.

23   Q.  How long have you been an ATF agent?

24   A.  Since March of 2016.

25   Q.  Are you involved in the investigation that led to the
```

1    charges against Mr. Carroll here today?

2    A.  I am.

3    Q.  All right.  I want to ask you a couple of questions here.

4    There's an allegation in this complaint -- did you swear to the

5    complaint?

6    A.  I did.

7    Q.  All right.  There's an allegation here that he is --

8    Mr. Carroll is a previously convicted felon.  Is that -- what

9    knowledge do you have about him being a convicted felon?

10   A.  I --

11            MR. WILLIAMS:  Stipulate, Judge.

12            MR. DYKE:  Okay.  Fair enough.

13            MR. WILLIAMS:  I have the record, the entire record

14   here, in fact, of the circuit court case.

15            THE COURT:  All right.

16            MR. DYKE:  That's fine.

17            THE COURT:  We'll stipulate that.

18            MR. DYKE:  Is there a stipulation as to the

19   interstate --

20            MR. WILLIAMS:  The potentials and -- I'm sorry?

21   BY MR. DYKE:

22   Q.  Was the gun manufactured outside of Kentucky?

23   A.  It was.

24   Q.  Okay.  How do you know that?

25   A.  Supervisory Special Agent Bradley Leveritt -- he is also an

1    interstate nexus examiner -- examined the firearm for me the

2    date that I signed the complaint, and he confirmed that it was

3    made in Connecticut.

4            MR. DYKE:  Okay.  That's all the questions I have.

5    Thank you.

6            MR. WILLIAMS:  No questions, Judge.

7            THE COURT:  All right.  Thank you.

8            MR. DYKE:  Oh, I'm sorry, Judge.  I didn't know you

9    were waiting on me.  I apologize.

10           THE COURT:  That's absolutely fine.

11           MR. DYKE:  Just to summarize, Your Honor, the

12   evidence, taken in the light most favorable to the Government in

13   this case, is that the officers, LMPD and ATF, were both

14   investigating the theft of a large number of firearms from a

15   location out on Dixie Highway.  A business or at least a

16   building owned by the fellow that owns Biff's Guns -- it sounds

17   like they are not firearms related to the business, but are

18   firearms related to -- or firearms that were personally owned by

19   Biff, or Mr. Summer, I should say, that a large number, possibly

20   as many as a thousand were taken.

21       During this investigation, Mr. Carroll's name came up as

22   possibly being involved in the theft.  When they heard that --

23   when they got a tip on October 3rd of 2018 -- I'm sorry.  And

24   the theft occurred sometime around the end of August of 2018.

25   On October 3rd of 2018, the officers, or the agents, got a tip

1    that folks were moving firearms out of this residence at 13304

2    Ashlawn, which is very close to where the theft occurred.

3        When they went to the scene, they were able to at least

4    perform some surveillance of it.  When they -- Detective Herring

5    was performing surveillance, he saw Mr. Carroll come out of the

6    house, go to a tricycle-type motorcycle that was parked at the

7    residence there and go to the back of the bike, open up this

8    storage container, or trunk, or whatever, for lack of a better

9    term, and then close it back and then go back into the house.

10       When the police got to the residence, they detained

11   Mr. Carroll, who was there in the house, along with

12   Mr. Whitaker, who was also there, and detained him because,

13   apparently, when they went into the house, there was -- they

14   believed that there were firearms present in the residence.  And

15   in the room where Mr. Carroll was located, there were a number

16   of tools, screwdrivers, knives, things like that.  So he was

17   placed in handcuffs and put in the -- in an EasyChair in the

18   living room while the agents sorted this out.  He did have an

19   arrest warrant for him but wasn't arrested on that day,

20   apparently.

21       Now, when they were going out of the residence, Detective

22   Herring wanted to find out what the -- I guess more information

23   about this tricycle-type motorcycle was.  And he asked one of

24   the officers to run it to see if it was stolen, and that came

25   back as not being stolen at that point.

1    He asked Mr. Carroll if there was anything in the trunk or

2    any weapons in the trunk, and Mr. Carroll's response was

3    something about a blown up gun or a blowed up gun.  And they

4    didn't really know what he was talking about until they looked

5    in the trunk.  They asked Mr. Carroll how to get into the trunk,

6    having seen him get into it before.  They used a screwdriver to

7    get in.  They discovered these two firearms.

8        The firearm that is the subject of the complaint was in this

9    -- partially in this soft-sided case.  The grip or the butt of

10   it was plainly visible.  There was another grip or butt that was

11   also plainly visible, but when they opened up the case, they saw

12   that one of these firearms had in fact blown up, for whatever

13   reason, had fired a cartridge that was too strong or the -- had

14   some kind of mechanical failure, but it was -- it suffered all

15   kind of damage, but you wouldn't know that unless you lifted

16   this -- the flap of this case up.

17       Mr. Carroll indicated that he had been driving the

18   motorcycle that day, that he apparently had been asked to work

19   on it by, I guess, the owner, somebody named Cosmo or Cosmos,

20   and was seen in -- as I said, in the trunk when the detective

21   was running surveillance.  And so the -- we have certainly an

22   admission by Mr. Carroll that -- and he is a convicted felon.

23   There's a stipulation.  And the gun was manufactured -- at least

24   the gun in the complaint was manufactured in Connecticut and,

25   therefore, had traveled in interstate commerce.

1     He obviously had knowledge of the firearms in the trunk.  He

2     indicated, when he was questioned, if there was anything in the

3     trunk.  He said a blowed up gun or a blown up gun -- excuse

4     me -- and that's, in fact, true, but you wouldn't know that

5     unless you were in the trunk and had either put them in the bag

6     or at least opened up the case and saw that they were there,

7     because you wouldn't know one was blown up or damaged unless you

8     opened the case.

9          That being -- those are the facts, Judge, and based on the

10    evidence, viewed in the light most favorable to the Government,

11    I believe that probable cause has been established to believe

12    that Mr. Carroll possessed a firearm on October 3rd of 2018.

13              THE COURT:  Thank you.

14         Mr. Williams.

15              MR. WILLIAMS:  Thank you, Judge.  Judge, I have done a

16    disservice to my client and the court.  I spent really two-and-

17    a-half hours in the library preparing to show you how specious

18    this case is.

19         As I said to Mr. Dyke the other day, it's been -- well, I've

20    been practicing law 45 years.  It's been so long since I have

21    had or done and know any other criminal defense lawyer who have

22    done a preliminary hearing, okay, I can't even remember, okay,

23    because they are rare.  They're rare creatures, rare breed.

24    Okay?

25         And my case law that I found -- I do have a cite.  I

1   happened to write down one of the cites, Judge.  Well, it's the

2   *Gerstein*.  That's one cite.  I don't know if that's one -- the

3   one I wanted, but, anyway, it's 420 U.S. 103, 95 S.Ct. 54.  And

4   for the life of me, I don't know whether that was on point to

5   what I wanted to make or not.

6       Then there's the case of -- what I'm really trying to

7   find -- *Coleman v. Burnett*, 477 F.2d 1187 at 1199 to 1200, D.C.

8   Circuit, 1973.

9       That case and other cases, Judge, talk about the purpose of

10  preliminary hearings and F.R.C.P. 58(b)(1), in essence, Judge,

11  that these proceedings, preliminary hearings, are to weed out if

12  they're frivolous, not to -- now, sure, the court can refer this

13  on to the grand jury.  The Government can decide that regards --

14  even if the court were to find lack of probable cause, they

15  could pursue it further.  I want to suggest, Judge, that this

16  case is just that frivolous, just -- and I don't want to insult

17  the Court's intelligence.

18      Way years ago when I -- we had older judges on the bench, we

19  lawyers would have to remind ourselves who we were going to --

20  we had judges who would fall asleep and get bored and so

21  forth --

22          THE COURT:  I'm still awake.

23          MR. WILLIAMS:  This court is, obviously, not -- and

24  hear everything we had to say.  And, Judge, I mean, just look,

25  look at this.  This is, by the detective's own admission -- and

1    I applaud him for being, I mean, just honest.  He didn't try to

2    make up anything.  He was honest.  Okay?  He can't dispute my

3    client was there to check on Mr. Whitaker, who had gotten

4    robbed.  Mr. Whitaker is a retired person.  Okay?  He had gotten

5    robbed.

6         There are other things which I didn't bring out on cross,

7    but I can't argue them now.  They're not in evidence, all right,

8    about his relationship with Mr. Whitaker and his concern for

9    Mr. Whitaker.

10        My client had no control over -- obviously, clearly did not

11   own the motorcycle.  He had no control over the motorcycle.  My

12   client works as -- now, I know this is not in the record

13   necessarily, but in talking with the PO the other day, she --

14   the PO Desiree -- I'm sorry.  I didn't get your last name,

15   Desiree -- but he is self-employed.  His self-employment is he

16   repairs cars.  He had a job for 20 some years for a company that

17   went out of business.  All right?  So that's what he does.

18        So he's over there.  Cosmos is there.  This is his story.

19   And the officer does not deny or say that he can't -- you know,

20   that he didn't tell him that.

21        What does someone do who works on cars or vehicles?  Mine's

22   in the shop now.  Three days to fix a tire, a flat.  Tafel

23   Motors, three days to fix a tire.  That's the price you pay when

24   you get an expensive car.  But anyway, what do you do?  You test

25   it.  You examine it.  You examine it.

1    So if he's riding on -- it makes sense he's out there riding

2    a motorcycle for Cosmos, who's been there in the house so -- oh,

3    Mr. Whitaker tells me that you work on cars.  So he would be on

4    the motorcycle.  It makes all the sense in the world.  That's

5    it.  He told him how he has to get in it, the only way you can

6    get in it.  How did he know?  Because he had been told -- asked

7    to work on the motorcycle, see if he could -- whatever was going

8    on with the motorcycle.  He didn't take the motorcycle there.

9        Detective Herring can't deny that the lady in the house, the

10   lady that was there told him that a blown up gun was in the

11   motorcycle compartment, told him that it's a blown up gun in

12   there.  He explained that to Detective Herring.

13       Nobody knows how long he had been there.  He just arrived

14   there.  Obviously, the person who was there before -- I mean,

15   how he got there even.  He certainly didn't ride the motorcycle.

16   And everybody else is gone.  The two people that -- leaving a

17   place where he has been three times -- and I would suggest that

18   there are several -- my limited time investigating this case

19   would confirm and I have witnesses who will confirm that that

20   house had been raided -- that's the word we use down in Harlan

21   County, in the country where I went -- been raided several times

22   since those guns have been stolen.

23       And this man, by the way, Judge, he has had a bench warrant

24   on him for several months.  I told the court, I got his record

25   right here.  Obviously -- and what do the police do when you

1   find someone with a bench warrant?  You arrest them, whether

2   it's in your jurisdiction or someone else's jurisdiction.

3       All the times that they had been there, he was never there.

4   This is not even a case, logically speaking, Judge, under the

5   law a decent case for constructive possession, much less

6   possession.

7       So he's in possession of that?  And not the blown up gun,

8   but the gun that came from across state somewhere, one of the

9   thousands of guns -- one of the thousands that was in this

10  place, I presume.  Felon in possession?  Judge, I'm going to

11  suggest to you that in my 45 years of practicing, I have not

12  seen -- I'm not exaggerating.  Now, you know, 45 years is a long

13  time.  I have not seen a weaker case of probable cause or

14  preliminary -- in a preliminary hearing as this one.

15      Now, I realize that the bar is very low when it comes to

16  preliminary hearings.  Judge, I want to suggest to you that the

17  bar in this case is rubbing carpet on this floor.  I want to

18  respectfully urge the court dismiss this case against my client.

19  If they think -- Mr. Dyke and the U.S. Attorney's Office thinks

20  this case is worth pursuing, let them -- let them take it

21  further.  Don't let them put it on you.  Thank you, Judge.

22              THE COURT:  Is there anything further?

23              MR. DYKE:  Ma'am?

24              THE COURT:  Anything further from the United States?

25              MR. DYKE:  No, ma'am.  Thank you.

1          THE COURT:  All right.  I'd like to take some time to

2     look this over.  We'll recess for about 15 minutes.

3          (Recess)

4          THE COURT:  Thank you.

5     I've made a determination in this case.  In a preliminary

6     hearing, this court is charged with determining whether there is

7     probable cause to believe that a crime has been committed and

8     that the defendant is the person who committed the crime

9     charged.

10         In this case, the crime charged is that Mr. Carroll violated

11    the law as a convicted felon in possession of a gun.  The first

12    part, whether Mr. Carroll is a convicted felon, has been

13    stipulated to by the defendant, and the evidence of record

14    clearly establishes this to be true.

15         The evidence presented in this hearing, viewed in the light

16    most favorable to the Government, also demonstrates that

17    Mr. Carroll was in possession of a gun at the time of his

18    arrest.  This court is satisfied that probable cause exists to

19    support the charge brought against Mr. Carroll.

20         Issues regarding the theft of the gun or guns is not before

21    this court.  Therefore, defense counsel's arguments regarding

22    whether others were involved in stealing or hiding guns is not

23    persuasive regarding whether probable cause exists to this

24    charge.

25         The criminal complaint in this case will move forward and

1    Mr. Carroll will be detained pending further proceedings.

2        The United States moves for detention in this case?

3            MR. DYKE:  Yes, ma'am.

4            THE COURT:  Does the defendant waive a detention

5    hearing or does he wish to go forward?

6            MR. WILLIAMS:  Yes, Your Honor, given the record, it

7    would really just be wasting the court's time.

8            THE COURT:  So is that a waiver of the detention

9    hearing?

10           MR. WILLIAMS:  Yes, ma'am.

11           THE COURT:  All right.  Do we have a date for further

12   proceedings?

13           DEPUTY CLERK:  Your Honor, the next grand jury is

14   October 20 -- wait, is October 17th, or November 6th, or

15   November 7th, and then arraignment could be after that.

16           MR. DYKE:  We'll present it October 17th.  I think the

17   arraignment date is the 25th.

18           DEPUTY CLERK:  That's correct.

19           MR. DYKE:  Okay.  So we'll present it to the grand

20   jury October 17th.  Assuming an indictment is returned,

21   October 25th would be our next date for arraignment.

22           THE COURT:  All right.  Then Mr. Carroll will be

23   detained pending review by the grand jury.  And if there is an

24   indictment, we will have an arraignment set for October -- what

25   was the date again?

1          MR. WILLIAMS:  What time would that be, you think,

2     Judge?

3          THE COURT:  What was the date again for the --

4          MR. WILLIAMS:  It was October 25th.

5          DEPUTY CLERK:  I believe it is at 9:30, but let me

6     double-check real fast.  Yes, 9:30 on October 25th.

7          THE COURT:  All right.  Are there any other issues?

8          MR. DYKE:  No, ma'am.

9          THE COURT:  Mr. Williams?

10         MR. WILLIAMS:  I'm sorry, Judge.  What was that?

11         THE COURT:  Are there any other issues?

12         MR. WILLIAMS:  No, ma'am.

13         THE COURT:  Anything further?

14         MR. WILLIAMS:  Thank you, Judge.

15         THE COURT:  All right.  We'll stand adjourned.

16         MR. DYKE:  Thank you, Your Honor.

17      (End of transcript.)

18

19

20

21

22

23

24

25

1                 C E R T I F I C A T E

2      I am an official court reporter for the U.S. District Court

3  for the Western District of Kentucky and certify that the

4  foregoing is a true and correct transcript, to the best of my

5  ability, of the above pages, of the digital audio recording

6  provided to me by the Court of the proceedings taken on the date

7  and time previously stated in the above matter.

8

       s/ Dena Legg              March 11, 2019

9  Official Court Reporter       Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

65

```
 1                              INDEX

 2    GOVERNMENT WITNESSES:

 3    DETECTIVE JOHNATHAN HERRING
           Direct Examination by Mr. Dyke              3
 4         Cross-Examination by Mr. Williams          19
           Redirect Examination by Mr. Dyke           50
 5
      SPECIAL AGENT ALEXANDER SANCHEZ
 6         Direct Examination by Mr. Dyke             51

 7

 8                             EXHIBITS

 9    GOVERNMENT:
      No exhibits
10

11    DEFENDANT:
      No exhibits
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```